Morning, Your Honor. My name is Steve Krafchick and I represent Debbie Takata. I understand. I understood we had 20 minutes. Is that incorrect? Fifteen. Fifteen. I'll have to hustle. This is a case that is really, I think, governed by prior precedent of Safon and Boonton, which I know the court is well familiar with. In this case, the initial denial rests primarily on a statement by Dr. Kakumbo where he checks a box, she checks a box, yes, and says, I agree that the claimant can work. And then there's vocational information. Yeah, but there's more than just check a box. She also said she needs to get rest periods. So it's not like she just checks something. It's not clean, but it's not as reasoned as the residual capacity questionnaires for chronic fatigue and fibromyalgia that she submitted with the appeal. Your problem is that she was caught on tape doing stuff she said she couldn't do. That sort of changes, reminds me a bit of the movie, The Fortune Cookie. Let me address that directly. Dr. Kakumbo said she couldn't work two consecutive days at ER 195 and said that she could not work eight hours. If you look at the surveillance, she never reaches eight hours of activity in any of the surveillance. Whether she can kick or instruct a class or do that really is immaterial. If the limits that Dr. Kakumbo set out- It's not immaterial because it matters just whether or not she can get another job in the economy. And when she got the benefits, she claimed she couldn't lift 15 pounds or push or pull. She couldn't stand for more than- She's doing all this stuff, which is wholly inconsistent with what she claimed when she got the benefits. I understand, Your Honor, but in this particular case, when she's doing the work at the taekwondo dojo where her husband owned and she's performing these activities, there's nothing inconsistent with being able to do those activities with either fibromyalgia or chronic fatigue syndrome, which are her diagnoses. The question for work- She's doing for seven, eight hours a day, two days running? No, she's not doing it for seven or eight hours. She's doing it for six hours or seven hours max, and that's total activity, and that is not the time that she's spending in surveillance at the teaching. She's only teaching for a couple hours a day. But she's spending six to seven hours a day in the martial arts studio, and she's not able to do a sedentary light job? No, she is not spending six or seven hours a day in the martial arts studio. I thought that's what you just said. No. I said, first of all, Dr. Kakumba said she can't work an eight-hour day and she can't work more than two consecutive days. If Dr. Kakumba's right, she can't work in any occupation because all of the occupations set out would require somebody to show up more than two consecutive days and at least eight hours a day. The surveillance only went for two hours a day at any time, and only parts of that time was she involved in teaching and doing kicking and the other stuff. But the reality is that in this particular case, in the initial denial, they looked at Dr. Kakumba and Dr. Kakumba's statements that the court has well. They looked at a vocational analysis, and they said that. So his attorney at the time, Mr. Whitlow, said, okay, I've got to find out if Dr. Kakumba really means what she said, and I need to see about the vocational aspects. So what he does is he presents vocational information and he presents the residual functional capacity evaluations. I submit to the court that those residual functional capacity evaluations are much more specific to fibromyalgia and chronic fatigue syndrome than the agreement with the statement that went to him first. And if you look at that statement that Dr. Kakumba made, you have to look at what he was told in the letter. And the letter tells him that Ms. Takata said that she couldn't work more than two hours per day. But on ER 217, where they look at the average day and the typical day and the good day and the bad day, it's clear that there are differences in what she can do on any given day. And in the surveillance that they did, they never went past the limits that Dr. Kakumba said that Ms. Takata could meet. So you think the surveillance was ineffective because it didn't surveil her for a full eight hours? It didn't surveil her for more than two days, and it didn't catch her doing activity on any of the four days that they did it for more than seven hours. And that activity was not all at the dojo. Some of it was driving, running errands, and the like. The whole thing she said she couldn't do, right, when she got the benefits? Well, the benefits were paid for 16 years, so the condition may have changed over that time. And earlier when she said she could do these things, maybe she could or couldn't. But if you look at what's happening at the specific time, which is in the investigator's evaluation of her, which was at, that's Craig Bean's evaluation, it's cited in the materials. The investigator finds that she says that she cannot, she has differences between a typical day and average day, average good day. An average day, a typical good day, and a typical bad day. But counsel, you wouldn't disagree that if her condition improved, that the insurer would be entitled to eliminate benefits. No, of course not. But you have to look at what evidence they had and what the judge did. And in this case, I believe that the initial denial never alerted Mr. Whitlow that they were going to evaluate the appeal for objective evidence. May I ask you, what objective evidence would you have presented had you been told, or had she been told? It's interesting. That not, she was told in the letter that she had to present medical rationale for the restrictions and limitations. Correct. Right? Correct. Then on the final denial, they said you didn't present objective evidence. Your best position, I would take it, is that she was told one thing, you have to present medical rationale. And she was denied on another ground, objective evidence. That's exactly right. And what you'd say is, well, if I'd been told about the objective evidence, I would have made a different showing than when I was told about medical rationale. My question to you, what objective evidence is there of fibromyalgia or chronic fatigue syndrome? There is objective evidence of fatigue being disabling that can be found on a physical capacity evaluation performed on a cardiopulmonary exercise test. That's in the literature. If I had been representing Ms. Takada back when Mr. Whitlow was, regardless of what they said, I would If you believe her, right? What? If you believe her. Well, I would question, but I would send her for a CPAT, a cardiopulmonary exercise test. But the question was you didn't present objective evidence, okay? And I think the question I heard Judge Baird ask is, what objective evidence would you present? And your answer, as I heard it, was, here is all this stuff, but it's all based on her statements. No, not at all. You misunderstand, Your Honor. There is a physical capacity test, which is a cardiopulmonary exercise test. It's a treadmill. Actually, they do it on a stationary bike. And they take somebody to their anaerobic threshold and see where it relates to people who can function without problems. And they also can test cognitive problems with neuropsych evaluations. But it also depends on her saying I can do it, if she decides to say I can't do it. No, no. The anaerobic threshold you can't fake. It's something that a runner doing a marathon, whoops, hits a wall. And that's their anaerobic threshold. When you're working beyond your anaerobic capacity, you have very little energy left there. And you will note in the transcript that you can't exceed it. But if you just say I can't pedal anymore, you can't pedal, you know, there's no way of telling. No, it's a physiological finding. The anaerobic threshold is when you can't do any more. And they can see it because they measure the oxygen intake. They measure other metabolic markers when they're doing this. And this is a test that if they had alerted Mr. Whitlow, he could have obtained. He also could have obtained. But it's your response that it was the obligation of the insurer to tell the attorney which test to obtain? Well, Mr. the defense counsel for Hartford in argument said we could have gotten a physical capacity test or we could have gotten a neuropsych test. Well, if the attorney knows that, why wouldn't Hartford know that? And if the rules are supposed to be to the benefit of the beneficiary and you have to disclose the information necessary to perfect your claim under the regulations, then they should tell them not only the objective evidence, but why don't you get a physical capacity test or a neuropsych test if you're complaining of fatigue and cognitive problems? Is there a case that says that the insurer has to be that specific in terms of telling the claimant what documentation has to be presented? What case authority are you relying upon to support your argument? Well, I'd start with Booten and Safon. Well, they're not that specific. No. They're not saying what you're arguing for here, that the insurer has to delineate precisely and specifically which tests have to be presented. I know there's a case cited in my materials, and I don't have it at the top of my mind, but I know that it's one of the progeny of Safon. Do you have a brief there? Pardon? Do you have your brief there? Do you like your brief to look at? Yeah, I did. I did. Did I help you? There you go. You want the gray brief, too? It's either Polutski or there's a case that begins with a D. I'm just blanking on the name. Well, if it's really crucial to your case, it would seem that you would have that readily handy. It's Bolyanska v. Epicentric. What's the citation for that? It's a Lexis site, 207 U.S. District Lexis, 81208. There might be a formal site now. Okay. And where is that from? What court? If you don't know, we can. Yeah, it doesn't say, but it says it's insufficient to simply inform a claimant that there is no objective evidence to support disability claim without specifying what type of objective evidence would substantiate the claim. Northern District of California. Okay. But basically, we're looking at an initial denial that doesn't say anything about objective evidence. The attorney responds with residual functional capacity questionnaires, which I think would meet a medical rationale, because here are the problems that people with fibromyalgia have, here are the problems that people with chronic fatigue has, here are her problems, here's what I think. Concluding with she wouldn't be able to work more than two days in a row and she wouldn't be able to work more than eight hours in a day. And if you look at the initial denial, which is 203 to 207, there's no mention of any kind of objective information or the inadequacy of subjective evidence type of information a doctor relies on in history. Do we have any cases, counsel, that say that cardiopulmonary tests are objective evidence of chronic fatigue syndrome or of fibromyalgia? And what's your basis for saying that? You know, I've been doing this for 20 years. I represent predominantly people with chronic fatigue syndrome and fibromyalgia. It's never been a case that has to be litigated up because when we've been... The answer is no. Correct. Correct. Not that I'm aware of. Is there anything in your briefs which tell us that a cardiopulmonary test is objective evidence that establishes a diagnosis of CFS or fibromyalgia? It doesn't establish the diagnosis, but it's consistent with the complaints of fatigue. So what it establishes is that the fatigue that somebody is... Consistent doesn't mean very much as far as... What it means is it documents... It documents the fatigue and shows a physiological basis for the fatigue. In other words, if somebody is pedaling on a bike, they hit their anaerobic threshold at a level 20, that's very low, and they have to get... Normal people could do it at 60 or 70 or whatever. I made those numbers up, but it's by example. And a neuropsychological test, that is... Is a well-known test. It's a battery. It's a two-day battery or a one-day battery with cognitive tests to test the cognitive ability and would get at the cognitive problem. It requires a response of the patient to establish a response? A neuropsychological test is based on the patient's responses. There's no objective measures as an electrocardiogram? Correct. The physical capacity test that I'm talking about, the CPAT, which Ms. Takata should get and we would present if we were given the opportunity, would probably document that she had physiological fatigue, and that would answer the question of the objective evidence. And we didn't get that chance. Thank you. Do I have any time left? You have negative time left. Okay. May it please the Court, I'm Michael Riley representing the appellees today. Mr. Riley, direct your argument, would you please, telling us why you think that the letter which said present medical rationale is consistent with your final denial letter saying you haven't presented any objective evidence. Why didn't you ask for objective evidence in the prior denial? Those two things seem inconsistent to me. Your Honor, this is a unique case where at the initial claim denial phase, you had Dr. Kakumba, the treater, concurring with the assessment that she could work. There was also a review of all the records, and all of those records in there indicated that based upon the surveillance and the inconsistencies that this Court has already noted between the surveillance and her actual interview, that she could work. Then things changed because it went to the appeal level, and at that point they submitted two items. They submitted Dr. Gorman's opinion, just that she had met with Ms. Takada. And then second, they submitted the treater, Dr. Kakumba's statement, and this is where it's now raised for the first time where Dr. Kakumba says, hey, that prior opinion that I gave you was wrong. And there's no real medical analysis behind it other than Dr. Kakumba says after one or two more visits she knows Ms. Takada better. But there was no medical analysis, there was no objectivity offered at that point as to how this change occurred. Well, for instance, she filled out two questionnaires, one on fibromyalgia, another one on chronic fatigue syndrome, and she found some response as to point muscle tenderness, right? That's true. Isn't that objective evidence? Well, no, Your Honor, because all of that's based on self-report. The questionnaire is a self-report. Well, if the doctor is poking you and you have pain in certain places and not in other places, is that self-report when you wince? Well, Your Honor, we've never challenged the diagnosis of fibromyalgia or chronic fatigue. We have challenged where was the objective data of impairment. The questionnaire did not. There wasn't any bend over and see if you can touch your toe, your shoes, let's see what you can do backwards, what's your range of motion. That's what you're talking about. That's correct, Your Honor. There was no objective data of that. And I think the important part that this Court needs to know is that Mr. Kravchuk keeps indicating that there was no opportunity to offer objective evidence, but the Court in Abadie and Safon indicated there's the pressure cooker relief valve. And that is if you think that the appeal denial letter surprised you and said you added some new requirement of objective data, the Safon case at 872 says, agreeing with Abadie, that you could submit a declaration at trial for the Court to consider. And at trial, Mr. Kravchuk specifically got up and said, had he known that there was a need for objective data of impairment, his statement at the transcript at 54 said he would have submitted a functional capacities assessment, that's the objective data I think you're asking about now, or a neuropsych evaluation. So from April of 2008 when the appeal denial comes out to September of 2012, there wasn't a surprise here. Mr. Kravchuk or prior counsel knew that there was a requirement for objective data and they could have submitted it. And the Court actually said in her decision, Judge Peterson's 34-page opinion, she mentioned again the Safon pressure relief valve argument and then it said if Takada had argued that such evidence actually existed, the Court may have allowed her to present it. Your position is even though the first letter denial was on medical rationale and the ultimate denial was on lack of objective evidence, between that denial and the decision of the District Court, there were four years in which time Mr. Kravchuk could have done what he just talked about, presented a pulmonary stress test analysis in an affidavit and submitted it to the District Court. That would not have been outside the required record which had been built in the claim denial. Well, it would have been accepted. Under the Abadie case and the Safon case, this Court has indicated when you feel like you're surprised, and that's what their argument is here, you then can submit this evidence and in the Abadie case, the trial court rejected the declaration that was submitting objective evidence, new evidence, and the Abadie Ninth Circuit reverses it. And in the Safon case, they said that seems to be the right rationale, the right way to go. So you're right, Your Honor. That's exactly the issue. They had four years, five years to get this information. We had three continuances in this case. The case was set for a Rule 52 or a Rule 56 motion, so certainly the counsel knew we were either going to go for a trial on the record that would be submitted or a motion for summary judgment. So that would be my answer on that. I don't think there was objective evidence of impairment. As to the scope of review of Hartford, whether it was independent or whether actually the determination was made by Battelle, right, could you address whether the trial court made an error there in disregarding the letters, which are I think in October 2007, indicating or reciting that the decision will be made by Battelle. That is explained by a misreading of the agreement, the unsigned agreement which said Battelle would make the determination. But then the later agreement saying Hartford would make the determination. But on a motion for summary judgment, couldn't a rational trier of fact come to the conclusion that the letters just blurted out the truth, that it really would be Battelle who made the determination and not Hartford? No, Your Honor. And the reason is there was uncontested declarations that were submitted in the record, specifically at SER 195 to 198, where the declarations were not contested here. They said we made a clerical error and they explained it. So I don't think there was an issue of fact because the letters are there, yes, but then it's uncontested that it was a clerical error and it was explained. Well, how could the plaintiff contest the claim of clerical error? Doesn't that go to the credibility of the person who's saying it's a clerical error? Well, no, Your Honor. There's no dispute of fact here. There's no – certainly Mr. Krafchick could have done discovery on this if he had wanted. There was no deposition. As a matter of fact, the discovery was allowed at this point. That's correct. Again, I think the bottom line is that coming into this, and maybe this is where I should address two things, which was we didn't have a summary judgment. It was contested here by the statements of fact or the legal briefing, and we believe that they didn't really raise these arguments effectively at trial anyway, and any of this now would be a new argument of the Ninth Circuit. But the next argument I think that's really most important is what is your standard of review here?  When you don't have a conflict, and I believe, again, there isn't any issue of fact that Hartford made the decision and Battelle is the funder of the benefit. So when you don't have any conflict at all, you get the pure, good old-fashioned abuse of discretion standard that says you can affirm if there is any reasonable basis. This is not a case where you have a conflict and where I think Judge Kleinfeld and Saloma describes the abuse of discretion standard in a conflict place as the skeptical arbitrary and capricious standard of review. This is just a pure is there any reasonable basis to support the decision, and we think there is that. Getting back to I think something else that was raised was the differences in the surveillance, which can't be understated here. When you have a case where it's a self-reported limitations of restrictions and limitations, the credibility of that claimant has got to be pretty important, and the surveillance versus the interview showed dramatic differences. For example, she says she couldn't do grocery shopping without her husband. That was the record at 137, but the surveillance showed that she went to grocery several times. She picked up large big bottles of seven bottles of different kinds of water. She says she never taught taekwondo. That's what she said in the interview. She denied teaching classes. That's the record at SER 137, but this record showed she was teaching. Not only was she teaching, she was doing high kicks. She was holding boards so the students could actually break the boards using roundhouse kicks. So this is someone who maybe she can't do full-time taekwondo, but certainly a sedentary job would be one that she could do, again, when you're looking at her credibility. She said that she had good days and bad days, and maybe you got her surveilled on a good day, and then she had a bad day. Well, that is what they say, but we'll also say this. In the interview, she said she only could stand an hour and that she only was functional two hours a day. That's what she said in the interview. She didn't say in that interview, I have two good days and then I'm out for many days. She took a very black-and-white position in that interview, saying she had only two hours of functionality, which wasn't proven. And, again, that's why I think the importance comes back to two things, which was after they appeal, Hartford didn't rest on the records. They went and had a rheumatologist look at all the records again, looked at Dr. Kukumba's refinement of her opinions, and actually made their own assessments. So this is another rheumatologist looking at this information. When you're looking at the good, old-fashioned, arbitrary and capricious, this is a very good basis to affirm you have a rheumatologist saying that she could work. Let me ask you about another issue that's raised. Mrs. Takada did procure a Social Security Disability Award, the standards of which are, I think you'll agree, more strict than the standards under Hartford. If she could get a Social Security Award, shouldn't she be able to get a Hartford Award? And, secondly, didn't Hartford disregard the Social Security Award and not give it the importance which the Montour case says we should give it? Okay, so two responses to that, Your Honor. Number one, I don't believe that because someone gets Social Security Disability, they're entitled to disability under the policy. There are different standards here. There are different considerations and different eligibility. Having said that, what we do know is this in this record. She did get Social Security Disability Awarded in 1991. That was 16 years go by. I think Judge Rawlinson had also raised the point, can she get better? And, actually, the record at SCR 129 to 133 that said after 1991, by 2005 she says her fatigue and muscle pain is not as severe and her lab exams were normal. So by 2005 we know she's improved, even by her own admission. But then what we have is in 2003 Social Security looks at her again and they affirm the disability finding. The Montour case does say that when you're looking at the Social Security decision, you should look at what they say and make the medical analysis. And I think the context of both the initial denial and the appeal denial both very understandably state why the Social Security determination wasn't valid anymore, at least for them. Because you had all these new records and new information that they didn't have in 1991 and certainly didn't have in 2003. Including the surveillance movies in 2007. You have her in 2005 saying she's doing better. You have the surveillance. And then you have Wing Chow did an independent medical examination where Dr. Chow said, this is record at 163, SCR 163, that it's unremarkable. She's very fit and toned. There isn't anything that indicates her restrictions and limitations. You had Nurse Watson's review. You had Dr. Kakumba initially saying this is the treater. She's okay. She can go to work. And then you have Houston, the eye doctor, knocking out her argument of tunnel vision because Houston says there aren't any vision problems. That's SCR at 80 and 81. Then you have Dr. Burns who does this final record review. So there was a lot of things that the totality of this letter shows Social Security didn't have. So I think we did comply with Montour when you're looking at medical analysis and rationale that in this case she Is she still denying Social Security benefits? I'm sorry? Is she still denying Social Security benefits? I believe she is. Yes, Your Honor. There's been no move to reconsider it? Not that I'm aware of. That's not in the record here for sure. So in the end, we think that Judge Peterson did an extraordinarily good job of looking at this case by not having the legal briefing on the plaintiff's side, relying totally on an oral argument to look through the facts and analysis. She spent 34 pages doing analysis. And in the end, if you think any letter was insignificant or not meeting any regulation, they had that Safon pressure cooker relief valve. They could have submitted that information. The judge said she would have considered it, and it wasn't submitted. We ask you to affirm the trial court. Thank you. Are you out of time? We'll leave you a minute for rebuttal if you wish to take it. Could you please address that last argument? Why didn't you submit from 2008 to 2012 a declaration under the Safon pressure cooker? I didn't represent Ms. Takata. I know, but that doesn't make any difference, does it? Somebody did. They didn't know about it. They didn't know to do it, would be my assumption, because if I get it, I handle a lot of problems. I want to cut your argument that she didn't have a chance to, if we have a law that says she can present it at the district court and it's not done. But if he doesn't know that that evidence could be existed, he couldn't know that he didn't present it. Well, that's between your client and her former lawyer, isn't it? If she has a right to do it under our law and she doesn't do it, she no longer has a claim that she was denied an opportunity to present evidence. The denial happens in 2007. So if you look at what Hartford had based on information in 2007, they had their surveillance. Not more than six hours a day of activity. Do I still deny social security? I believe so, yes. And she hasn't presented this evidence to the administration to get a reconsideration, I gather. Well, why would she? I mean, of course not. To be honest, perhaps? No, because if what Dr. Kakumba has said, that she can't work more than two consecutive days and she can't work eight hours in a day, then there's no job that defendants have listed in any of their listings that requires somebody to work more than two days in a row and work at least eight hours a day consecutively. The government might well decide that's the case, but the fair thing would be for her to present this new evidence and have the government reconsider it. Anyway, that's another case for another day. Yeah, the fair thing would be to give us a chance to present the evidence. That's what we're asking for. Thank you. Okay. Case decided. We'll stand submitted.
judges: Kozinski, Rawlinson, Bea